## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CHARLES F. SHORT III | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Judge |
| v. | ) | |
| | ) | No. |
| BRAD S. GRAYSON, | ) | |
| SEAN M NELSON, | ) | |
| STRAUSS & MALK, LLP, | ) | |
| JOSEPH J. SIPRUT, | ) | |
| ALEKSANDRA M.S. VOLD, | ) | |
| SIPRUT, PC, and | ) | |
| TED DONNER | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

NOW COMES Charles F. Short III ("Short") and through his attorneys and for his complaint states as follows:

### Jurisdiction and Venue

1. This matter is brought pursuant to 28 U.S.C. 1332 because the parties are diverse and the amount sought is greater than $75,000 exclusive of interest and costs.

2. Venue is appropriate in this forum based on the fact that Short was represented by the defendants in this district and the defendants practice law within this district.

### Nature of the Case

3. This is a case about a visionary businessman who developed or participated in the development of numerous patents that together, among other things, enable GPS coordinates to be displayed on a map in real time, which has enabled numerous companies to maximize their

1

logistical capabilities. Short, through a series of unscrupulous events, lost his ownership stake in the aforementioned patents ("Patent Portfolio") and, beginning in December 2010, filed suit in the Circuit Court of Lake County, Illinois against some of the parties that participated in and/or benefitted from the misconduct related to Short's loss of ownership of the Patent Portfolio.

4.      Defendants were Short's attorney's whose collective malpractice in representing Short included but was not limited to 1) failing to file all of the claims arising from the same facts or circumstances; 2) failing to include all necessary parties; 3) failing to advise Short on filing deadlines; 4) failing to file claims prior to statute of limitations deadlines, 5) failing to properly allege facts to establish Short's claims; 6) misinforming Short of what the court ordered; 7) misstating the law; 8) upsetting the judge to the point that he initially stated that he would sanction Short individually, and 9) forcing Short to defend himself related to said sanctions motion which to this day is undecided.

5.      Defendants breached the duty of care in their individual and collective representation of Short.

### The Parties

6.      The Plaintiff, Short, is an individual and resident of the State of California. Short is sometimes referred to by his nickname, Randy. Short is a citizen of California.

7.      Defendant Brad S. Grayson, upon information and belief, is a licensed attorney residing and practicing law in Illinois. Based upon this, we believe Brad S. Grayson is a citizen of Illinois.

8.      Defendant Sean M. Nelson, upon information and belief, is a licensed attorney residing and practicing law in Illinois. Based upon this, we believe Sean M. Nelson is a citizen of Illinois.

2

9. Defendant Strauss & Malk, LLP is, upon information and belief, a law firm in Illinois with locations in Chicago, Northbrook, and Lake Forest. Based upon this, we believe Strauss & Malk, LLP is a citizen of Illinois.

10. Defendants Joseph J. Siprut, upon information and belief, is a licensed attorney residing and practicing law in Illinois. Based upon this, we believe Joseph J. Siprut is a citizen of Illinois.

11. Defendant Aleksandra M.S. Vold, upon information and belief, is a licensed attorney residing and practicing law in Illinois. Based upon this, we believe Aleksandra M.S. Vold is a citizen of Illinois.

12. Defendant Siprut, PC is, upon information and belief, a law firm in Illinois with a location in Chicago. Siprut PC is an Illinois registered professional corporation and, upon information and belief, its principal place of business is in Chicago, Illinois. Based upon this, we believe Siprut, PC is a citizen of Illinois.

13. Defendant Ted Donner, upon information and belief, is a licensed attorney residing and practicing law in Illinois. Based upon this, we believe Ted Donner is a citizen of Illinois.

## The Players

14. Sidewinder Holdings, Ltd. ("SHL") is a company formed after its predecessor, Mobile Information Systems ("MIS"), filed for bankruptcy. MIS contributed to and SHL completed the creation of the Patent Portfolio. SHL was formed when Ian J. Pye, via his investment arm (Meridian Ventures), agreed to provide some of the capital necessary to purchase MIS's assets.

15. Sidewinder Europe, Ltd. ("SEL"), formerly known as MIS Europe, was a wholly

owned subsidiary of SHL that covered the European territory.

16.    Sidewinder Asia Pacific Pty. Ltd. ("SAP"), formerly MIS Asia Pacific, was a wholly owned subsidiary of SHL that covered the Austral/Asia territory.

17.    Ian J. Pye ("Pye"), is an individual residing and doing business at all relative times in Illinois. Pye is a highly sophisticated businessman who owns and controls multiple entities.

18.    Meridian Ventures, Inc. ("Meridian") is a Delaware corporation registered and doing business in the State of Illinois and elsewhere in the United States. One prior name of Meridian, prior to April 2002, is Encordia, Inc. ("Encordia"). Meridian maintains its Illinois registered office in Deerfield, Illinois and its registered agent is Rochelle Slater. Meridian is owned and controlled by Pye.

19.    Meridian Leasing Corporation is an Illinois corporation registered and doing business in the State of Illinois. Meridian Leasing Corporation maintains its Illinois registered office in Deerfield, Illinois and its registered agent is Rochelle Slater. Meridian Leasing Corporation is owned and controlled by Pye.

20.    Euroadvice, Inc. F/K/A Sidewinder North America, Inc. ("Euroadvice") is an Illinois Corporation formed in August 2005 as Sidewinder North America, which maintains its registered office in Deerfield, Illinois where its registered agent is Rochelle Slater.

21.    Other companies owned and controlled by Pye, on information and belief, include but are not limited to: 1) Merex Technology, Inc.("Merex"), Pye's "parent" entity in which he is the sole owner; 2) The Meridian Group, an entity wholly owned by Merex; and 3) subsidiaries of the Meridian Group including but not limited to Meridian Ventures (above), Meridian Leasing Corporation (above), Meridian Information Services, and Meridian IT Solutions (collectively

4

"Meridian Group Entities"). These entities appear to be created to form a complicated maze of companies in an effort to insulate Pye and others from liability from wrongdoing.

22.     Rochelle Slater, Secretary and General Counsel of SHL, was also highly involved in several of Pye's other entities.

23.     Anthony Hughes, Chief Financial Officer of SHL from its inception and SHL Director starting in 2005, also worked for Encordia/Meridian Ventures. Hughes was a direct employee of Pye.

24.     George D. Best ("Best") is an individual who, on information and belief, resides in the State of Texas and does business throughout the United States, including in the State of Illinois. Best was Short's right hand man and confidant at MIS.

25.     Sidewinder N.A. Ltd. ("SNA") was originally formed as a wholly owned subsidiary of SHL that covered the North American territory. SNA was formed on January 25, 2001. On December 20, 2005, SNA changed its name to Best Outdoors of Texas Corporation ("Best Outdoors"). Best was the president of SNA. Pye was the Chairman of SNA's Board of Directors.

26.     4SameDay Solutions GP LLC (collectively, with 4SameDaySolutions, Ltd, as "4SameDay"), was controlled by Best. On information and belief, 4SameDay bought the assets, client base, accounts payable, exclusive license to use SHL's software in North America, and a right to purchase the Patent Portfolio from SHL. 4SameDay obtained these assets from SHL for nominal consideration.

27.     4SameDay Solutions, Ltd. (collectively, with 4SameDay Solutions GP LLC, as "4SameDay") is an entity formed by Best. On information and belief, 4SameDay Solutions, Ltd. was created after Best sold all of the former SNA assets (except for the right to purchase the

5

Patent Portfolio) to Eric Reese, a former key customer of SHL. Upon information and belief, Eric Reese is still operating a company named 4SameDay.

28.     Circle4 Technologies ("Circle4") is an entity created by Best on August 26, 2009. On information and belief, Circle4 was created to hold the profits from the Patent Portfolio infringement settlements.

29.     Acacia Research Corporation, Acacia Patent Acquisition, LLC, Acacia Patent Acquisition Corp., and Telematics Corporation (collectively "Acacia"), are patent "trolls" who collect patents and then prosecute companies that are infringing on patents within their portfolio.

30.     Dan Gresham ("Gresham") is a lawyer and partner with the law firm Thomas Horstemeyer (formerly Thomas Kayden, et.al) in Atlanta, Georgia. Gresham and his firm represented Acacia.

31.     Ed Treska ("Treska"), is an attorney at Acacia who, upon information and belief, was Senior Vice President and General Counsel to Acacia and was in charge of the Telematics portfolio.

## Background Facts

### A. Short, Buckley, and Galbraith Form MIS.

32.     In 1994, Short formed Mobile Information Systems, Inc. ("MIS") with two friends, William F. Buckley, Jr. ("Buckley") and Evan G. Galbraith ("Galbraith"). Short owned 75% of MIS.

33.     One of the principal assets of MIS was a series of patents ("Patent Portfolio") which Short invented or participated in inventing and which he managed in his capacity as the President and Chief Executive Officer of MIS.

34.     The Patent Portfolio included numerous patents relating to systems and methods

for displaying mobile vehicle information on a map. Short was responsible for initiating and creating the Patent Portfolio beginning in 1992 at a predecessor company. He continued to build and develop the Patent Portfolio during his time at MIS and, later, at Sidewinder Holdings, Ltd.

35.    The patents in the Patent Portfolio include United States Patent Nos. 5428546, 5594650, 5636122, 5758313, 5884216, 5904727, 5922040, 6026345, 6087952, 6088648, 7085775, 6889139, and Australian Patents 015517-000110 (Australian pending 015517-000113).

36.    The technology covered by the Patent Portfolio is utilized extensively today by major telecommunications companies, transportation companies, field service technicians, and any company utilizing location-based mapping devices and mobile communication, including Sprint, Verizon, AT&T, Motorola, Navman, General Motors, Ryder Trucks, and UPS.

37.    The market for the Patent Portfolio had not yet developed in the late 1990's and in or about 2000, when MIS's financing dried up, MIS was forced to file Chapter 11 bankruptcy in the U.S. Bankruptcy Court for the Northern District of California.

**B.  Sidewinder is formed and obtains the Patent Portfolio.**

38.    During the aforesaid Bankruptcy, Short met with a number of potential investors interested in purchasing the assets of MIS, including Pye.

39.    Short and Pye both invested capital to get SHL off the ground.

40.    Pye, Short, Buckley, and Galbraith created a new entity, Sidewinder Holdings, Ltd. ("SHL"), with the intent of purchasing the MIS assets, including the Patent Portfolio.

41.    SHL was to be formed and incorporated in Delaware, with Short to take a full-time position in the new company as its Chairman of the Board and Chief Executive Officer.

42.    Prior to the founding of SHL, Short recruited Best, a former MIS employee, to become involved in SHL as an employee and minority shareholder. At MIS Best was Short's

right hand man and confidant and, because he worked so closely with Short, Best knew the potential value of the Patent Portfolio.

43.     The shareholders in SHL, when it was incorporated in January, 2001, included Encordia, which became Meridian, a company completely controlled and owned by Pye, which held a 50% ownership interest, Short, who held a 34% interest, and Buckley, Galbraith, and Best who collectively held 16%.

44.     With approval of the bankruptcy court in 2001, SHL purchased the Patent Portfolio and other assets of MIS from the bankruptcy estate.

45.     A 2001 Encordia brochure notes the value of the Patent Portfolio, specifically stating "Sidewinder owns intellectual property, which is innovative, leading its field and has enormous potential."

### C. SHL elects directors and establishes subsidiaries.

46.     In April 2001 SHL held its initial shareholder's meeting where Pye, Galbraith, and Short were elected as directors. Short was then elected Chairman of the Board and Chief Executive Officer ("CEO"). Short received a three year employment contract.

47.     Also as a result of the April 2001 SHL shareholders meeting, Best was named Senior Vice President of SHL and President of SNA (below). Best, like Short, received a three year employment contract.

48.     SHL established three regional market subsidiaries. The North American market was assigned to Sidewinder N.A., Ltd. ("SNA"), the European market was assigned to Sidewinder Europe Ltd. ("SEL"), and the Asian market was assigned to Sidewinder Asia Pacific Pty Ltd. ("SAP").

### D. Pye methodically increases his control over SHL.

8

49. After formation, SHL's business was largely financed by a loan held by Meridian.

50. Between March 2002 and December 2004, the Meridian loan was refinanced several times. With each refinancing of the loan, Meridian, and therefore Pye, increased its ownership share of SHL and diluted the other SHL investors proportionately.

51. The loan agreement with Meridian provided a security interest in all of SHL's assets, Patent Portfolio, and in the shares of all of the wholly owned subsidiaries.

52. In December 2002, Meridian was issued an additional 500 shares in SHL, giving Pye a controlling interest in SHL.

53. After gaining control of SHL, Pye refused to follow Short's advice of making the Patent Portfolio profitable by hiring a law firm to bring actions against companies infringing on the patents. By not exploiting the patents, Pye assured that SHL would continue to need loans from Meridian and thusly assured Meridian's ever increasing stake in SHL.

54. In March 2003, Pye advised Short that Meridian would not continue financing SHL unless Short agreed to a number of changes in the management and ownership structure of SHL.

55. Upon receiving the change in management concessions he requested from Short, which gave Pye more power, Pye agreed to have Meridian extend its line of credit to SHL through the end of December, 2003.

56. The net effect of the concessions Short made to Pye during this credit extension was a reduction of Short's interests in SHL to 15%.

57. In December 2003, when the loan matured again and the company, under Pye's control, was still unable to pay off the loan, Pye advised Short that in order for the company to

continue with a renewed loan from Meridian, Meridian would need to be granted additional shares in the company (further diluting Short's interest in SHL).

58.    Pye also demanded that Short step down as SHL Chairman, CEO, and director on December 31, 2003 as additional terms in the December 2003 Meridian loan refinancing.

59.    Galbraith also resigned his position on the Board of Directors in December, 2003, leaving control of SHL in the hands of a new Board comprised of Pye, Best, and David Anthony Hughes ("Hughes"), a Meridian employee controlled by Pye.

60.    Galbraith and Buckley's SHL stock interests, like that held by Short, had been steadily diluted by Meridian's increasing interest in the company.

61.    By February 2004, Short's role was limited at SHL to minority shareholder and consultant on contract.

62.    By early 2004, Pye had become SHL's CEO and Chairman of the Board, Best had become a Director and President, Rochelle Slater was General Counsel and Secretary, and Hughes had become a Director and was Chief Financial Officer.

63.    By 2005, Short's interest in SHL had been diluted from 34% to approximately 12%, while Meridian increased its ownership share to over 75%. Pye, through Meridian, now had nearly complete control of SHL.

**E. Pye repeatedly threatened to fire Short and replace him with Best, repeatedly recanted, and distracted Short by directing him to fruitlessly pursue a MBO and a merger partner.**

64.    On July 22, 2002, Pye wrote Short and informed him that, in order to secure additional financing from Meridian, Short would have to resign as a SHL Director, Chairman, and CEO and sign a shareholder agreement giving Meridian the right to sell SHL. Pye indicated

he planned to promote Best to CEO, and Best would thereafter report directly to Pye.

65.   Short would not have made his initial investment in SHL if he knew Best would become the CEO.

66.   In August, 2002, Pye changed his mind and allowed Short to continue in his role as Director, Chairman, and CEO of SHL.

67.   On March 5, 2003, Pye wrote Short indicating his intention to find a strategic partner and make "immediate changes to the organization" including installing Best as SHL's President. Pye further directed Short to spend his time searching for a strategic partner.

68.   On March 16, 2003, Pye and Short met and Pye agreed to allow Short to retain his position as CEO of SHL. The agreement included the conditions that Short lead a merger buyout ("MBO") of Meridian's position in SHL, that Short retains Noble & Company ("Noble"), a Scottish investment bank, to facilitate the MBO, and that Meridian will purchase SNA provided that Best approves the acquisition.

69.   On April 28, 2003, Noble facilitated a meeting with Electra, a UK venture firm, who indicated a willingness to back the MBO.

70.   In June, 2003, Electra agreed to invest $11 million in the SHL MBO.

71.   On July 3, 2003, Pye interfered with the MBO by trying to negotiate a partnership between Meridian and Electra. Pye emailed Noble and indicated that Meridian would be willing to partner with Electra so long as Short 1) resigns as an officer and director of SHL, and 2) sells his shares in SHL (15%) to Meridian for $100,000. A 15% stake at $100,000 indicates Pye's valuation of SHL and all of its assets was roughly $666,666, far lower than the $11 million Electra agreed to pay for 75% (a valuation of roughly $14.67 million).

72.   In August, 2003, due to Pye's interference, Noble resigned as SHL's investment

11

bankers and the Electra deal fell apart.

73.     Also in August, 2003, Pye instructed Short to retain a new investment bank and seek a merger partner for SHL.

74.     On August 8, 2003, Short retained RW Baird's London office as SHL's new investment bankers.

75.     On September 3, 2003, RW Baird introduced SHL to David Brisco, CEO of ServicePower Technologies, PLC ("SPT"), a United Kingdom based company that was SHL's primary competitor.

76.     On December 12, 2003, Pye informed Short that his employment agreement with SHL will not be renewed on January 1, 2004.

77.     On December 17, 2003, after a couple months of negotiation, Short obtained a letter of intent from SPT.

78.     On December 18, 2003, Pye changed his mind about not renewing Short's employment agreement.

79.     On December 18-19, 2003, SHL's Board reviewed and agreed to the SPT merger.

80.     On December 19, 2003, Pye instructed Short to finalize the SPT merger.

81.     On December 23, 2003, Pye retracted his instruction to finalize the SHL/SPT merger, pulled out of the deal, and reinstated the December 12, 2003 termination of Short's SHL employment.

82.     On December 30, 2003, Short resigned from SHL as CEO, Chairman of the Board, and Director.

83.     On February 12, 2004, Short entered into a six-month consulting agreement with SHL.

12

**F. Pye refuses to generate revenue by allowing SHL to exploit its Patent Portfolio.**

84.     When Pye and Short discussed pursuing the patent infringement cases, in April 2004, Pye told Short that he had no interest, that it was of insignificant value, and that he was more interested in consolidating SHL's other businesses into Meridian.

85.     In late 2004 through early 2005, Short continued to demand that Pye take some action to pursue the value of the Patent Portfolio.

86.     In early 2005, Short again tried to persuade Pye to pursue the value of the Patent Portfolio, even recommending Pye meet with a specific, vetted patent law firm in Chicago, Illinois, to discuss the hiring of that firm to pursue patent infringement cases on a contingency fee basis against the growing number of companies that were infringing on the Patent Portfolio and using that technology to amass hundreds of millions of dollars in profit.

87.     Short further expressed that he personally spoke to the Chicago firm, discussed the Patent Portfolio with them, and verified they were interested in joining forces. Pye continued to refuse to prosecute the Patent Portfolio.

**G. Pye offers to buy Short out while Best secretly creates new entities.**

88.     Now holding a 12% interest in SHL, knowing that Pye refused to generate revenue from the Patent Portfolio and fearing that Pye will use the lack of revenue to further extend Meridian's position and further dilute minority shareholders, Short seriously considered Pye's offer to buy Short's shares outright in April, 2005.

89.     Pye offered to buy Short's 12% for $120,000 and originally agreed to "top up" his offer by giving Short the Patent Portfolio.

90.     In an e-mail dated April 28, 2005, Short wrote Pye to confirm the agreement.

91.     On May 9, 2005 Pye responded via e-mail, stating "in order to preserve whatever

value [SHL] retains, we need to continue to own the patents." Pye further stated that SHL could not license exclusivity in North America.

92.     By the summer of 2005, Pye and Best had started to work on a strategy that would allow them to exploit the Patent Portfolio without having to share the profits with Short, Buckley, or Galbraith.

93.     On June 30, 2005, Best entered into an agreement to sell his shares in SHL to Meridian. That agreement was executed on July 15, 2015.

94.     Also on June 30, 2005, Best resigned as a Board member and President of SHL and the Board altered the bylaws of SHL and reduced the number of Directors of SHL to two. As of July 1, 2005, Pye and Hughes were the only remaining Board Members. Slater continued in her role as General Counsel and Secretary.  In fact, on information and belief, Best was a shareholder and Director beyond July 1, 2005 as he indicated as such to Short during a teleconference in August 2007.

95.     On July 15, 2005, Best incorporated the 4SameDay entities in Texas.

96.     The name "4SameDay Solutions" had been a trade name used by SNA, thusly SHL had a proprietary interest in the name as well as in the business associated with the name.

97.     Upon information and belief, Best was able to use the "4SameDay" name without repercussion only because he knew SHL would consent to such use and would not claim infringement.

98.     Best was employed by SHL in 2005 and was also a Director and shareholder of SHL in 2005.

99.     At the time Best created his 4SameDay entities he owed fiduciary duties to the shareholders of SHL.

14

100.    Neither the existence of Best's "4SameDay" entities, nor their business purpose, was disclosed to minority shareholder Short.

101.    What was also not disclosed is that these new entities would be used by Pye and Best to divest SHL of the Patent Portfolio and to cheat Short out of his interest in the profits generated by exploiting the Patent Portfolio.

**H.  Pye distracts Short with an offer to sell SHL assets, including the Patent Portfolio, while continuing to increase Meridian's ownership of SHL.**

102.    In October 2005, Pye proposed to Short that he put together a plan to buy out Meridian's interest in SHL, including the Patent Portfolio.

103.    Pye suggested an agreement pursuant to which Short would put together the capital necessary to purchase the Patent Portfolio, SEL, and SAP for a total in excess of $3 million, while selling his shares back to SHL for a relatively nominal sum, such that Short would not be sharing in the proceeds from the sale.

104.    Pye also told Short that he should decline any personal recovery whatsoever from whatever came from the Velocity Litigation (noted below).

105.    In response, Short engaged investors and obtained a letter of intent to purchase SEL, SAP, and the Patent Portfolio, for a total price of $3.5 million. Short presented the letter of intent to Pye and Pye verbally agreed to its terms.

106.    Short advised Buckley and Galbraith at that time that he intended to buy the Patent Portfolio from SHL and that he had lined up investors to do so.

107.    In November 2005, Buckley and Galbraith sold their remaining shares in SHL to Meridian.

108.    By November 2005, Pye, via Meridian, owned 88% of SHL. Short was the only

other shareholder at 12%.

109.    In an effort to appease Pye and further encourage Pye to sell him the Patent Portfolio, Short agreed to Pye's request to release his right to any personal recovery from the Velocity Litigation.

110.    Pye told short, however, that they could not close on Short's purchase of the Patent Portfolio, SEL, and SAP until the Velocity Litigation was finalized.

## I.    The Velocity Litigation

111.    Aside from the patent portfolio, SHL had another substantial asset it had yet to exploit in the Summer of 2005, its interest in the so-called "Velocity Litigation".

112.    Velocity Express, Inc. ("Velocity") had been a customer of MIS prior to the bankruptcy in 2001. Velocity, at some point, had stopped making payments to MIS for equipment it had received from the company.

113.    When SHL negotiated to purchase MIS's assets, Velocity objected. Velocity also filed an adversary claim in the bankruptcy proceedings, naming MIS, SHL, Short and a small number of other creditors as parties.

114.    The MIS bankruptcy was in turn dismissed by agreement, with approval of the bankruptcy court, in a way which allowed for the transfer of assets to SHL while also providing a carve out for Velocity to continue pursuing its claims against SHL, MIS, and Short (and for them to pursue counterclaims against Velocity) in what was eventually referred to as the "Velocity Litigation".

115.    The Velocity Litigation began in state court in Santa Clara County, California, and was subsequently removed to Federal District Court in California where it continued until late 2005.

116. On July 29, 2005, an order granting partial summary judgment was entered against Velocity, resulting in a finding that could have cost Velocity in excess of $10 million.

117. The Velocity Litigation was settled in December, 2005, resulting in almost $3 million to SHL.

**J. Pye kills the deal with Short to buy the Patent Portfolio, SEL, and SAP.**

118. After the Velocity Litigation was settled, Short fully expected Pye to meet with him to close their agreement for the purchase of the Patent Portfolio, SEL, and SAP.

119. Pye then told Short he would have to put off the meeting until after he returned from a trip to Europe for the Christmas holidays.

120. On January 5, 2006, Pye told Short that he would not proceed with Short's purchase because he had already sold the Patent Portfolio, SEL and SAP to an "unrelated industry company" for $3 million in December 2005.

121. When Short pressed Pye to identify the purchaser, Pye refused and stated that he had signed a confidentiality agreement which prohibited him from divulging the purchaser.

**K. Pye leverages Short to sell his 12% stake in SHL**

122. Pye also told Short that the $3 million realized from the sale of the Patent Portfolio, SEL, and SAP was used to pay SHL's debt to Meridian, and that SHL no longer had any assets and all ownership interests in SHL were essentially worthless.

123. Despite Pye's zero valuation of SHL's ownership interests, he then offered to buy Short's 12% stake in SHL for $120,000. Pye told Short that he had two options: take the $120,000, or get nothing. Further, Pye did not dissolve SHL despite its debts being paid off and it being essentially worthless.

124. Short knew and had repeatedly told Pye that the Patent Portfolio was worth tens if

not hundreds of millions of dollars, and Short had reason to believe that the sale for as little as $3 million was a bad business decision. Short also knew that he had no recourse against Pye for what, on its face, appeared to be Pye's bad judgment.

125.    In reliance on Pye's representations, accordingly, Short sold his 12% stake in SHL to Meridian for $120,000.

126.    Short, however, never would have agreed to sell his shares in SHL to Meridian for such a low value if he was aware of what really happened, particularly that at the time of the sale SHL still owned the Patent Portfolio and had only pledged to sell it to Best for nominal consideration.

127.    Pye, as officer, director, and the controlling shareholder of SHL, owed fiduciary duties, a duty of loyalty, a duty of care, and other duties to Short irrespective of any confidentiality agreement with third parties.

128.    In early 2006, Pye (via his ownership of Meridian) held a full 100% of SHL's stock.

**L.  What really happened.**

129.    On or about June 30, 2005, Best entered into an agreement with SHL, through Pye, pursuant to which Best acquired all of the stock in SNA and certain SHL software ("the June 30, 2005 Sale"). In addition, upon information and belief, the agreement provided that SHL was to eventually assign to Best those patents that were specifically related to the software, which included some or all of the patents in the Patent Portfolio. On information and belief, Best acquired SNA, SHL software, and the right to future assignment of the Patent Portfolio for the mere delivery of a $300,000 non-recourse promissory note. On SHL's books, however, it appeared that SHL sold SNA for one dollar. Best then formed 4SameDay to operate as the next

version of SNA.

130.    Because no money was paid related to the June 30, 2005 Sale, it enabled Pye and Best to hide the transaction on SHL's books.

131.    At the time of the transaction, both Pye and Best knew that the Patent Portfolio and SNA were likely worth millions. Indeed, SNA's sister entities, SEL and SAP, were sold by SHL in 2005 for $3 million without the Patent Portfolio. Per an August 2007 teleconference between Short and Best, SNA without the Patent Portfolio was worth the equivalent of SEL and SAP combined, roughly $3 million.

132.    At the time of the June 30, 2005 Sale, both Pye and Best were Directors of SHL, Best was a shareholder in SHL, and Pye indirectly owned a controlling interest in SHL via his ownership of Meridian. As such, both Pye and Best had personal interests which conflicted with the best interests of SHL's other shareholders. In addition, Hughes, the only other SHL Director at the time, was a Meridian employee controlled by Pye. Therefore, the entire Board of Directors had a conflict when SHL engaged in the June 30, 2005 Sale.

133.    Even if Best had stepped down as an officer and board member of SHL earlier in the day on June 30, 2005, the remaining Board members were still conflicted and the sale to Best was blatant self-dealing.

134.    On information and belief, prior to entering the June 30, 2005 Sale the SHL Board neglected to appraise the value of the assets that were subject to the sale. In addition, the conflicted members of SHL's board did not seek the consent of the non-interested shareholders prior to entering into the June 30, 2005 Sale, even though SHL was a closely held company.

135.    SHL's Board of Directors did not disclose the June 30, 2005 Sale to the other shareholders of SHL, namely Short, Buckley, and Galbraith, at any time in 2005 or 2006.

19

Indeed, Best and Pye actively concealed the June 30, 2005 Sale from Short.

**M. Short reads a press release that appears to support Pye's statements.**

136.    In the late spring of 2006, Short saw a copy of a press release stating that SPL World Group, a large utility software company which was subsequently purchased by Oracle, had purchased SEL and SAP, along with all intellectual property relating to the business.

137.    This was consistent with what Pye represented to Short and therefore served, in his mind, to confirm what Pye had told him; that Pye had sold SEL, SAP, and the Patent Portfolio to an unrelated industry company, thus ending any apparent chance for Short to realize the benefits of his interests in the Patent Portfolio.

138.    Upon information and belief, in May 2006, SEL and SAP were sold to SPL World Group. Further, as a condition of that sale, 4SameDay and Acacia had to sign an agreement not to pursue SPL World Group on infringements on the Patent Portfolio.

**N. Short discovers the Patent Portfolio was not sold to SPL World Group, but instead was sold to 4SameDay/Best.**

139.    In late May or early June, 2007, Short received a surprising telephone call from Dan Gresham ("Gresham"), a lawyer representing Acacia Research Group, LLC ("Acacia"), who informed him that Acacia owned the Patent Portfolio. Acacia's counsel further explained that Acacia had purchased the Patent Portfolio from an entity named 4SameDay.

140.    Sometime following the June 30, 2005 Sale, 4SameDay began to negotiate a lucrative agreement to assign the rights in the Patent Portfolio to Acacia Patent Acquisition Corp. ("Acacia PA"), a subsidiary of Acacia.

141.    On information and belief, those negotiations, followed by an extensive due diligence review by Acacia, resulted in Acacia and 4SameDay entering into a letter of intent in

February of 2006 for Acacia to purchase the Patent Portfolio from 4SameDay, provided 4SameDay had clear title to the Patent Portfolio.

142.    The terms of letter of intent, and upon information and belief, the eventual contract between 4SameDay and Acacia, included an upfront cash payment of $130,000 plus a 15% interest in the licensing and any settlements received in patent infringement litigation payable to 4SameDay.

143.    On information and belief, Acacia has since received substantial sums of money in proceeds from settlements with at least 34 large corporations (including Sprint, Verizon, AT&T, UPS, General Motors and Penske) in patent infringement cases stemming from the Patent Portfolio.

144.    Thusly, on information and belief, 4SameDay/Best, in turn, have received substantial revenue arising from the Patent Portfolio.

145.    Apparently concerned that Short's claims against good title in the Patent Portfolio could impact on whether Acacia had good title, and in hopes of resolving the matter, in July, 2007, Gresham introduced Short to an Acacia representative, Ed Treska ("Treska"), who in turn set up a conference call with Best and Short.

146.    Short repeatedly told Treska that he believed he had been defrauded in the sale of his shares of SHL, explaining to Treska what Pye told him in January, 2006 and the events leading up to those misrepresentations.

147.    Treska urged Short to settle his grievances with Best and not to sue, indicating that if a lawsuit muddied title to the Patent Portfolio neither 4SameDay, Acacia, nor Short would benefit from the patent infringement cases.

148.    In August 2007, at Treska's insistence, Short spoke to Best over the telephone

21

about 4SameDay owning the Patent Portfolio and the deal with Acacia. During that call Best told Short that 4SameDay purchased the Patent Portfolio from SHL in July, 2005 for approximately $300,000 in the form of a non-recourse promissory note assuming the debt of SNA.

149.    These facts were directly contrary to the representations made to Short by Pye in January 2006. Not only had the sale of the Patent Portfolio not occurred in December, 2005, but the "unrelated third party industry company" to which the Patent Portfolio was sold was actually a company owned by Best, an SHL insider.

150.    Best further confirmed that no independent valuation had been done of the SHL assets prior to the June 30, 2005 Sale and that he was an officer and director of SHL when the offer to purchase SNA and the Patent Portfolio was entered into, and that he voted on the sale.

151.    Best confirmed that Pye set the prices for the June 20, 2005 Sale and both Best and Pye voted to approve the sale

152.    Best also confirmed that the officers and directors of SHL and SNA on June 30, 2005 were the same people, namely Pye, Best, Hughes, and Slater.

153.    Best further confirmed that at no time since becoming a director of SHL in December, 2003, did he or any other officers or directors of SHL attempt to retain patent litigators in order to exploit the patent portfolio for SHL.

154.    Best also confirmed that discussions with Acacia and the due diligence process with Acacia regarding their purchase of the Patent Portfolio began in January 2006.

155.    Best further confirmed that he was in contact with Acacia while he was still a SHL Board member.

156.    Treska was aware of the sum and substance of Best's representations to Short at the time, and, despite his personal knowledge of the history of the Patent Portfolio, Treska at no

time told Short that anything Best had told him was false. Treska/Acacia would have known at the time of the letter of intent with 4SameDay (February 2006) that SHL still owned the Patent Portfolio, because the letter of intent explicitly said 4SameDay had to deliver clear title.

157.    Additionally, In August 2007 Treska knew that 4SameDay obtained clear title in April 2006, because shortly thereafter, in June 2006, Acacia bought the Patent Portfolio from 4SameDay under the terms of the letter of intent. This confirms Treska's complicity in hiding from Short the true facts of the date that 4SameDay acquired the Patent Portfolio from SHL. By hiding the true facts from Short, Treska protected Acacia's interest in the Patent Portfolio.

158.    On August 28, 2007, following the teleconference, Best wrote to Short, warning him that any action Short might take would be "frivolous" and "vigorously defended" since Best's company had purchased "clear title to [all assets and associated patents]" in July of 2005. Best emphasized that this transaction had taken place "months before [Short's] sale of stock in January of 2006".

159.    Short thus believed that the Patent Portfolio had been transferred to 4SameDay/Best in July 2005.

**O.  Short learns that SHL held the Patent Portfolio when he sold his 12% stake in January, 2006.**

160.    On November 22, 2011, the court in a Georgia Patent Litigation made certain findings which confirm not only that Pye and Best both lied to Short, but also that SHL still owned the Patent Portfolio until they were assigned in April 2006.

161.    The court specifically found as follows:

> "Contrary to Mr. Best's representation that the assignment [of the Patent Portfolio to his company] occurred on December 31, 2005 [a representation he made under oath in an affidavit], the document memorializing the assignment notes April 21, 2006 as the date of assignment...and April 21, 2006 is acknowledged as the date of formal

assignment in Mr. Best's reply brief…[I]t is undisputed that in February 2006, 4SameDay executed an agreement to assign its rights to a number of patents, including the patents-in-suit, to Acacia Patent Acquisition Corp., a subsidiary of Acacia Research Corporation (collectively "Acacia")…The assignment took place on June 19, 2006. Under the terms of the agreement with Acacia…, 4SameDay retained the right to receive a percentage of 'the net profits, royalties, revenues, and other proceeds arising from [the] licensing and enforcement of the assigned patents…"

162. The agreement between 4SameDay and Acacia thus was negotiated while SHL still held title to the Patent Portfolio, the title to which SHL held until April 2006, title both Pye and Best represented had passed long before [to Short].

163. Upon information and belief, Telematics, and Acacia subsidiary, realized tens, if not hundreds, of millions of dollars in revenue from settlements related to infringements of the Patent Portfolio, revenue from which Best shared in via his affiliation with 4SameDay.

164. Upon information and belief, Pye benefitted from the settlements related to the infringements of the Patent Portfolio either through his affiliation with 4SameDay or through the deal with 4SameDay related to SHL's sale of the Patent Portfolio.

165. The price at which Short sold his 12% interest in SHL was substantially less than what he ever would have considered but for Pye's misrepresentation that SHL no longer held the Patent Portfolio and the SHL stock was virtually worthless.

**P. SHL's officers and board members breached their duties of loyalty and care owed to Short.**

166. By approving the June 30, 2005 Sale without properly assessing the value of SNA and the assets sold to Best/4SameDay, SHL's board and officers breached the duty of care owed to shareholders.

167. By approving the June 30, 2005 Sale for inadequate consideration, SHL's board and officers breached the duty of care owed to shareholders, including Short.

24

168.    By approving the June 30, 2005 Sale to an insider, without bringing in disinterested shareholders and/or outside board members, SHL's board and officers breached the duty of loyalty owed to shareholders.

169.    By misrepresenting the details surrounding the June 30, 2005 Sale, Pye/Meridian, as majority shareholder, Chairman of the Board, Chief Executive Officer, and Director, breached his fiduciary duties and other duties owed to minority shareholder Short.

170.    By misrepresenting the details of the June 30, 2005 Sale, Best, as officer and director of SHL, breached his fiduciary duties and other duties owed to Short.

171.    By self-dealing related to the June 30, 2005 Sale, Best breached his fiduciary duties, duty of loyalty, and other duties owed to Short.

172.    Therefore, Short had direct and derivative claims against SHL's board and officers, namely Pye, Best, Hughes and Slater, for breaching their fiduciary duties, duty of loyalty, duty of care, and other duties and Short had a direct claim against Pye/Meridian for minority shareholder oppression.

## Q. Pye/Meridian, Best/4SameDay, and Acacia participated in defrauding Short.

173.    By misrepresenting the facts surrounding the June 30, 2005 Sale, and convincing Short to sell his 12% stake in SHL for inadequate consideration, Pye/Meridian defrauded Short.

174.    Therefore, Short had direct claims including but not limited to fraud, fraudulent inducement, fraudulent misrepresentation, conspiracy, and aiding and abetting fraud against Pye/Meridian.

175.    By misrepresenting the facts surrounding the June 30, 2005 Sale and the subsequent sale of the Patent Portfolio, thusly buying time during which he benefitted greatly from said misrepresentations, Best/4SameDay defrauded Short.

25

176.   Therefore, Short had direct claims including but not limited to fraud, conspiracy, aiding and abetting fraud, interference with economic expectancy and unjust enrichment against Best/4SameDay.

177.   By actively concealing the details of the June 30, 2005, Sale and the subsequent sale of the Patent Portfolio, Pye/Meridian, Best/4SameDay, and Acacia aided and abetted and conspired in the fraud and other claims.

178.   Therefore, Short had direct claims including but not limited to aiding and abetting fraud and conspiracy to commit fraud against Pye/Meridian, Best/4SameDay, and Acacia.

179.   By benefitting via aiding and abetting the fraud against Short, or conspiring to commit a fraud against Short, Acacia is liable.

180.   Therefore, Short had a claim against Acacia.

R. **Short retains attorneys to pursue litigation**

181.   On October 15, 2010, Short entered into an engagement agreement with attorneys Ted Donner and Mattaniah Eytan (collectively "Donner") for representation in the SHL matter. (Exhibit 1).

182.   December 30, 2010, Donner filed the original complaint and listed: 1)  Pye; 2) Best; 3) 4Sameday Solutions GP LLC; 4) Best Outdoors of Texas Corporation  F/N/A Sidewinder N.A.; 5) Meridian Ventures, Inc.; 6) Euroadvice, Inc. F/K/A Sidewinder North America, Inc.; and 7) 4SameDay Solutions, Ltd. as defendants.

183.   The original complaint contained six counts: 1) Fraud (as against Pye and Best); 2) Breach of Fiduciary Duty (as against Pye and Best); 3) Unjust Enrichment (as against all defendants); 4) Constructive Trust (as against all defendants); 5) Accounting (as against all defendants); and 6) Respondents in Discovery (noted below).

184.    The original complaint lists four Respondents in Discovery: 1) Rochelle Slater; 2) Acacia Research Corporation; 3) Telematics Corporation; and 4) Meridian Leasing Corporation.

185.    On (or about) October 14, 2011, the original complaint was dismissed without prejudice. In dismissing the complaint the judge requested the Plaintiff add the following additional information: 1) A specific allegation defendants did not have the right to do what they did; or 2) a specific allegation that the sale price of SNA and the Patent Portfolio was inadequate, and 3) state any objection to the SEL and SAP sale, and 4) whether Plaintiff is complaining that the proceeds of the sale of SEL and SAP went to pay debt. Additionally, the judge requested Plaintiff to: 1) allege the sale was wrongful; 2) state more specifically that SHL owned the Patent Portfolio; 3) allege what value SHL had beyond the Patent Portfolio; and 4) that Short would not have sold his 12% interest in SHL but for Pye's misrepresentations.

186.    On December 2, 2011, Donner filed the First Amended Complaint for An Accounting and Additional Relief and listed: 1) Pye; 2) Best; 3) 4SameDay Solutions GP LLC; 4) Best Outdoors of Texas Corporation F/K/A Sidewinder N.A.; 5) Euroadvice, Inc. F/K/A Sidewinder North America, Inc.; 6) 4SameDay Solutions. Ltd.; 7) Meridian Ventures, Inc.; 8) Meridian Leasing Corporation; 9) Acacia Research Corporation; 10) Acacia Patent Acquisition, LLC; 11) Acacia Patent Acquisition Corp.; and 12) Telematics Corporation as defendants.

187.    The First Amended Complaint for An Accounting and Additional Relief contained six counts: 1) Conspiracy to Defraud (as against Pye and Best); 2) Breach of Fiduciary Duty (as against Pye and Best); 3) Aiding and Abetting a Conspiracy to Commit Fraud (as against Acacia); 4) Unjust Enrichment (as against all defendants); 5) For Imposition of Constructive Trust (as against all defendants); and 6) For and Accounting (as against all defendants).

188.    On April 2, 2012, the Court ordered Plaintiff to file an additional amended complaint due to changes in the status of defendants.

189.    On April 9, 2012, Donner filed the Second Amended Complaint for An Accounting and Additional Relief and listed: 1) Pye; 2) Best; 3) 4SameDay Solutions GP LLC; 4) Best Outdoors of Texas Corporation, F/K/A Sidewinder N.A.; 5) Euroadvice, Inc. F/K/A Sidewinder North America, Inc.; 6) 4SameDay Solutions Ltd.; 7) Meridian Ventures, Inc.; 8) Acacia Research Corporation; 9) Acacia Patent Acquisition, LLC; 10) Acacia Patent Acquisition Corp.; and 11) Telematics Corporation as defendants.

190.    The Second Amended Complaint for An Accounting and Additional Relief contained six counts: 1) Conspiracy to Defraud (as against Pye and Best); 2) Breach of Fiduciary Duty (as against Pye and Best); 3) Aiding and Abetting a Conspiracy to Commit Fraud (as against Acacia); 4) Unjust Enrichment (as against all defendants); 5) For Imposition of Constructive Trust (as against all defendants); and 6) For and Accounting (as against all defendants).

191.    Donner never filed a derivative action against SHL's officers and board members, namely Pye, Best, Hughes, and Slater.

192.    Donner did not include all of the necessary parties, including but not limited to Circle4, Merex, the Meridian Group. and the Meridian Group Entities.

193.    On June 7, 2012, the court granted Donner's motion to withdraw.

194.    On June 17, 2012 Short entered into an engagement agreement with Siprut, P.C. and Joseph Siprut for representation in the SHL Matter (Short v. Pye, Best, et. al). (Exhibit 2).

195.    On June 21, 2012 Siprut met with Pye's attorney, Howard Teplinsky. In Siprut's subsequent e-mail to Short about the meeting, Siprut takes Teplinsky's account of the events as

fact and informs Short "I need to do legal research and refine our theories based on these facts, but the key facts in this case are quickly crystalizing. I don't think the value of the case against Pye is very high, given these facts..." Despite Siprut's valuation of Short's claims against Pye, Siprut chose only to name Pye and Best as defendants in his Third Amended Complaint. (Exhibit 3).

196.    In an April 10, 2015 affidavit, Siprut stated that Teplinsky indicated that he had documents that proved Pye no longer held an ownership interest in the Patent Portfolio, that Teplinsky indicated he would provide those documents, that Teplinsky never provided those documents, and that, despite the absence of proof the documents existed, Siprut relied on Teplinsky's assertion that the documents existed and omitted "certain allegations" in the Third Amended Complaint based on Teplinsky's assertions.

197.    On July 13, 2012, a court order granted Plaintiff leave to amend the complaint.

198.    The July 13, 2012 order acknowledged Plaintiff dismissed without prejudice defendants: 1) Acacia Research Corp.; 2)Acacia Research Group, LLC.; 3) Acacia Patent Acquisition, LLC.;4) Acacia Patent Acquisition Corp.; and 5) Telematics Corporation. ("Acacia" defendants). (Exhibit 4).

199.    Aleksandra M.S. Vold ("Vold") prepared the July 13, 2012 order.

200.    On September 12, 2012 Siprut filed the Third Amended Complaint, listing: 1) Pye; and 2) Best as defendants.

201.    Sipurt and Vold were listed as Short's attorneys related to the Third Amended Complaint.

202.    The Third Amended Complaint did not list Meridian, Euroadvice, or 4SameDay as defendants, despite the fact that Short's claims against them had not been dismissed.

203. Siprut also did not include other necessary parties, including but not limited to Best Outdoors, Circle4, Merex, Meridian Group, and the Meridian Group Entities.

204. Siprut never filed derivative claims against SHL's officers and directors, namely Pye, Best, Hughes, and Slater.

205. On October 16, 2012, Siprut emailed Short explaining that "You can't bring a claim on behalf of a corporation that doesn't exist any longer". This was factually inaccurate because SHL was not defunct.

206. In a later e-mail on October 16, 2012, Siprut clarified "Because you are not a shareholder currently, you couldn't bring the case derivatively even if you wanted to…" This is not only a misstatement of the law, it also goes against advice Siprut later gives to Short's third attorney, Grayson.

207. The Third Amended Complaint contained five counts: 1) Breach of Fiduciary Duty (against Pye and Best); 2) Fraudulent Inducement (against Pye); 3) Fraudulent Misrepresentation (against Pye); 4) Conspiracy to Commit Fraud (against Pye and Best); and 5) Unjust Enrichment (against Pye and Best).

208. On March 8, 2013 the Court dismissed counts: 1) Breach of Fiduciary Duty; 4) Conspiracy to Commit Fraud; and 5) Unjust Enrichment, with prejudice. This included all of the claims against Best.

209. Also on March 8, 2013, the remainder of the Third Amended Complaint, Count 2) Fraudulent Inducement and 3) Fraudulent Misrepresentation, were dismissed without prejudice.

210. On March 9, 2013, Siprut e-mailed Short and noted the judge dismissed counts 2 & 3 with prejudice, and the other counts without prejudice. This was the opposite of what the judge ordered. Siprut expanded upon his lie, stating "…the judge said he wanted more

30

allegations on the fraud, linking the pieces together", and "the defendants' lawyers likely believe that this case is unlikely to get dismissed at the pleadings stage, and it will move forward at some point in the long run". This is misleading, as all of the charges against Best were dismissed with prejudice, the conspiracy to commit fraud charge was dismissed with prejudice, and Siprut had previously assessed Short's claims against Pye as "not very high".

211.    On March 28, 2013, Siprut emailed Short and apologized for misrepresenting what the court ordered, noting "my initial email had a scrivener's error."

212.    On March 13, 2013, Siprut emailed Short stating that he had lunch with Best's lawyer, indicating Best's lawyer is talking settlement and is planning to advise his client to divvy "up the ownership of the patent portfolio." This was a blatant lie, as all charges against Best had been dismissed with prejudice and, upon information and belief, Best's lawyer told Siprut that, under no circumstance, would Best give Short any money.

213.    On March 26, 2013, Siprut e-mailed Short and indicated that he had had heard from Best's attorney that Best is refusing to settle. In the same email Siprut informed Short that he planned on withdrawing as Short's attorney.

214.    On February 1, 2016, in open court on a related matter, Best's lawyer denied ever talking to Siprut about settlement.

215.    On April 10, 2013, Short signed an engagement agreement with Strauss & Malk, LLP and attorneys Brad S. Grayson and Sean M. Nelson (collectively "Grayson") for representation in the SHL matter. At this point, Siprut was substituted by Grayson as Short's attorney. (Exhibit 5).

216.    On April 9, 2013, Siprut advised Grayson that going forward Short may want to re-file the claims that were dismissed as a derivative action.

217.    On May 1, 2013, Grayson filed the Fourth Amended Complaint and listed: 1) Pye; 2) Best; 3) Meridian Ventures, Inc.; 4) 4SameDay Solutions GP LLC; and 5) 4SameDay Solutions, LTD as defendants.

218.    The Fourth Amended Complaint contained three counts: 1) Rescission of Short's Sale of Stock in [SHL] Based Upon Fraud; 2) Breach of Fiduciary Duty (derivative claim); and 3) Minority Shareholder Oppression.

219.    The Fourth Amended Complaint did not list Hughes as a defendant, despite the derivative claim and the fact that Hughes was a Director of SHL and its Chief Financial Officer ("CFO") at the time SHL sold the Patent Portfolio to 4SameDay for inadequate consideration. Hughes was also the CFO if SNA.

220.    The Fourth Amended complaint did not list Rochelle Slater as a defendant, despite the derivative claim and the fact that Rochelle Slater was General Counsel and Secretary of SHL at the time SHL sold the Patent Portfolio to 4SameDay for inadequate consideration. Slater was also General Counsel and Secretary of SNA.

221.    Grayson also did not include other necessary parties, including but not limited to Best Outdoors, Circle4, Merex, Meridian Group, and the Meridian Group Entities.

222.    The Fourth Amended Complaint did not include fraudulent misrepresentation or fraudulent inducement claims against Pye, despite the fact that those claims were dismissed without prejudice as part of the Third Amended Complaint.

223.    On October 4, 2013 the Court granted the defendant's motions to dismiss all counts of the Fourth Amended Complaint with prejudice. The order dismissed the case in its entirety.

224.    The defendants in the underlying case then filed a motion for sanctions against

32

Short only.

225. Grayson continuously represented to Short after October 4, 2013, through the date he withdrew, that the judge mistakenly entered the order dismissing the case. Grayson also continuously reassured Short during this period that the motion for sanctions would be denied.

226. On February 14, 2014, Judge Berrones Ordered sanctions individually against Short awarding Defendants Pye, Meridian Ventures, Best, 4SameDay Solutions GP LLC, and 4SameDay Solutions, Ltd.'s expenses and reasonable attorney's fees.

227. After February 14, 20014 Grayson withdrew from the case and Short hired a new attorney.

228. The new attorney convinced Judge Berrones not to sanction Short and, instead, set an evidentiary hearing which was held on February 1, 2016.

229. Short did not discover any malpractice of any attorneys until after Grayson withdrew from the case. It was only after Grayson withdrew that Short could ascertain that certain claims had been lost as a result of the statute of limitations.

230. The malpractice claims identified below are based upon claims that are not part of the Lake County case because the claims are not part of that case based upon the negligence of the defendants.

## Count I
## Legal Malpractice against Donner

231. It is apparent that, as of the signing of the October 15, 2010 engagement letter, Donner and Short had an attorney client relationship. (Exhibit 1).

232. A Duty of Care arose between the Plaintiff and Defendants which included but

33

was not limited to:

    a.  A duty to investigate all facts and circumstances to gain an understanding of the legal situation.

    b.  A duty to include all necessary parties.

    c.  A duty to raise all claims against the defendants that arise out of the same facts and circumstances.

    d.  A duty to advise the client as to when his claims expired due to the Statute of Limitations and filing deadlines.

    e.  A duty to properly allege all claims to sustain a viable action.

    f.  Other duties established by the law and the facts of the case.

    g.  A duty to do a competent job to avoid getting the client sanctioned.

    h.  Other duties

233.  The defendant breached the Duty of Care in at least the following ways:

    a.  Failed to bring a derivative action for breach of fiduciary duties, duty of care, and other duties before the statute of limitations expired against Pye, Best, Slater, and Hughes. This breach is dependent upon a finding of when the statute of limitations expired. In other words, if the statute of limitations expired on any of these claims during the time Donner represented Plaintiff, then Donner breached the standard of care by failing to file the claims.

    b.  Upset the judge to the extent the judge wanted to sanction Plaintiff for the inept job of the attorneys.

234.    But for the negligence of Donner, Plaintiff would not have lost his chance to pursue the derivative claims identified above and would have recovered on all claims.

235.    But for the negligence of Donner, Plaintiff would not have had to bear the expense of defending a motion for sanctions.

236.    The Plaintiff suffered damages which include but are not limited to:

    a.    Money Damages owed to plaintiff for his share of the monies made in the patent enforcement litigation and for all future monies made in the enforcement of the patents.

    b.    Money damages from the derivative claims.

    c.    Other intangible and tangible damages motion.

    d.    Legal fees and cost which include but are not limited to defending a sanctions motion.

    e.    Cost of this suit.

**Count II**
**Legal Malpractice against Siprut/Siprut PC and Vold**

1.    It is apparent that, as of the signing of the June 17, 2012 engagement letter, Siprut/Siprut PC, and Short had an attorney client relationship. (Exhibit 2).

2.    Further, as a Siprut PC attorney, Vold made appearances, contributed to the drafting of the Third Amended Complaint (Exhibit 3), and drafted the July 13, 2012 order (Exhibit 4). Therefore, Vold and Short had an attorney client relationship.

3.    A Duty of Care arose between the Plaintiff and Defendants which included but was not limited to:

    a.    A duty to investigate all facts and circumstances to gain an understanding of the legal situation.

    b.    A duty to include all necessary parties.

c. A duty to raise all claims against the defendants that arise out of the same facts and circumstances.

d. A duty to advise the client as to when his claims expire due to the Statute of Limitations and filing deadlines.

e. A duty to properly allege all claims to sustain a correct action.

f. Other duties established by the law and the facts of the case.

g. A duty to give the client sound legal advice.

h. A duty to advise the Plaintiff if he had any legal malpractice claims against his prior attorneys.

i. A duty to do a competent job to avoid getting the client sanctioned.

4. The defendants breached the Duty of Care in at least the following ways:

a. Failed to bring a derivative action for breach of fiduciary duties, duty of care, and other duties before the statute of limitations expired against Pye, Best, Slater, and Hughes. This breach is dependent upon a finding of when the statute of limitations expired. In other words, if the statute of limitations expired on any of these claims during the time defendants represented Plaintiff, then defendants breached the standard of care by failing to file the claims.

b. Failed to include all necessary parties in Amended Complaint Three, including but not limited to Best Outdoors, Euroadvice, Meridian, Meridian Leasing Corporation, Acacia, and the various "Meridian Entities" controlled by Pye.

c. Failed to timely file suit against the Acacia defendants prior to the July 13,

36

2013 refiling deadline.

    d. Failed to properly allege facts to establish the claims Plaintiff had against various defendants.

    e. Failed to advise Plaintiff about the fact that he had any claims against prior attorneys for Legal Malpractice.

    f. Upset the judge to the extent the judge wanted to sanction Plaintiff for the inept job of the attorneys.

5.    Siprut/Siprut PC additionally breached the Duty of Care in each of the following ways:

    a. Misstated to Plaintiff what the judge ordered when the judge dismissed the Third Amended Complaint.

    b. Misinformed Plaintiff that he was discussing a potential settlement with Best after all claims against Best were dismissed with prejudice.

    c. Misstated the law related to bringing a derivative action.

6.    But for the negligence of the defendants, Plaintiff would have recovered substantial monies on all of the claims that could be pursued and would have timely brought suit against all persons who breached duties to Plaintiff and SHL.

7.    The Plaintiff suffered, as a direct and proximate result of Siprut's negligence, damages which include but are not limited to:

    a. Money Damages owed to plaintiff for his share of the monies made in the patent enforcement litigation and for all future monies made in the enforcement of the patents.

    b. Money damages for all derivative and personal claims.

37

c.  Other intangible and tangible damages.

d.  Legal fees and cost which include but are not limited to costs to defend against a sanctions motion.

e.  Cost of this suit.

### Count III
### Legal Malpractice against Grayson/Nelson/Strauss & Malk LLP

1.  It is apparent that, as of the signing of the April 10, 2013 engagement letter, Grayson/ Nelson/Strauss & Malk LLP and Short had an attorney client relationship. (Exhibit 5).

2.  A Duty of Care arose between the Plaintiff and Defendants which included but was not limited to:

a.  A duty to investigate all facts and circumstances to gain an understanding of the legal situation.

b.  A duty to include all necessary parties.

c.  A duty to raise all claims against the defendants that arise out of the same facts and circumstances.

d.  A duty to advise the client as to when his claims expire due to the Statute of Limitations and filing deadlines.

e.  A duty to properly allege all claims to sustain a correct action.

f.  A duty to advise Plaintiff if he had any claims for Legal Malpractice against prior attorneys in the case.

g.  Other duties established by the law and the facts of the case.

h.  A duty to do a competent job to avoid getting the client sanctioned.

3.  The defendants breached the Duty of Care in at least the following ways:

    a.  Failed to list Hughes and Rochelle Slater as defendants in the derivative action.

    b.  Failed to include all necessary parties, including but not limited to Best Outdoors, Merex, Euroadvice, Meridian, Meridian Leasing Corporation, Acacia, and the various "Meridian Entities" controlled by Pye.

    c.  Failed to raise the Fraudulent Inducement and Fraudulent Misrepresentation claims against Pye in the Fourth Amended Complaint.

    d.  Failed to timely file suit against the Acacia defendants prior to the July 13, 2013 deadline.

    e.  Failed to properly allege facts to establish the claims Plaintiff had against various defendants.

    f.  Failed to advise Plaintiff about the fact that he had any claims against prior attorneys for Legal Malpractice.

    g.  Upset the judge to the extent the judge wanted to sanction Plaintiff for the inept job of the attorneys.

4.   But for the negligence of the defendants, Plaintiff would have recovered substantial monies on all of the claims that could be pursued and would have timely brought suit against all persons who breached duties to Plaintiff and SHL.

5.    The Plaintiff suffered damages which include but are not limited to:

    a.  Money Damages owed to plaintiff for his share of the monies made in the patent enforcement litigation and for all future monies made in the enforcement of the patents.

    b.  Money damages for all derivative and personal claims.

    c.   Other intangible and tangible damages.

    f.   Legal fees and cost which include but are not limited to costs to defend

       against a sanctions motion.

    d.   Cost of this suit.

**Jury Demand**

WHEREFORE, Short prays for a judgment in his favor in an amount to be found against the

defendants and for further relief that is just and equitable in the circumstances.

CHARLES F. SHORT III

By: /s/ Joseph T. Gentleman
One of His Attorneys

Joseph T. Gentleman (ARDC NO. 6244501)
33 North Dearborn St.
Suite 1401
Chicago, Illinois 60602
(312) 263-7000