UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES F. SHORT, III,                              )
                                                    )
                      Plaintiff,                    )          Case No. 16-cv-2150
                                                    )
             v.                                     )          Hon. Steven C. Seeger
                                                    )
BRAD S. GRAYSON, STRAUSS &                          )
MALK, LLP, JOSEPH J. SIPRUT,                        )
SIPRUT P.C., and TED DONNER,                        )
                                                    )
                      Defendants.                   )
_____)

**MEMORANDUM OPINION AND ORDER**

Plaintiff Charles F. Short, III has engaged in two long-drawn-out legal battles. He fired

the first salvo in 2010, when he sued his former company and several former colleagues in state

court. He basically alleged that he did not know the full story when he agreed to sell his interest

in that company.

A series of attorneys for Short came and went. Ted Donner represented Short at the

outset of the case, but he withdrew about a year and a half later. The second attorney, Joseph

Siprut, then entered the case, but he was gone within a year. A third attorney, Brad Grayson,

then entered the scene and handled the final leg of the case. The changing of the legal guard did

not prevent a bad outcome – in 2013, the state court dismissed Short's case.

Unsatisfied with that loss, Short opened a second front. This time, he directed his aim at

his lawyers. He filed this suit in federal court in 2016, bringing legal malpractice claims against

his three former attorneys and two law firms.

The first attorney in the state court legal battle, Ted Donner, now moves for summary

judgment. He advances a number of challenges to the malpractice claim, including the statute of

limitations. As Donner points out, a malpractice claim has a two-year statute of limitations, but Short sued in 2016 about a lawsuit that ended in 2013.

For the reasons stated below, Donner's motion for summary judgment is granted.

## Background

This federal case is about a bad outcome in state court. The state court case was about Short's sale of his stock in a company called Sidewinder.

Plaintiff Charles F. Short, III owned shares in a holding company called Sidewinder Holdings, Ltd. *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 5 (Dckt. No. 239). He invested in Sidewinder early on, and he participated in managing and operating the company from the day of its founding until the end of 2003. *Id.* at ¶ 6. He was the CEO and chairman of the board until December 2003. *See* Fifth Am. Cplt., at ¶¶ 32, 42 (Dckt. No. 194).

An investment firm, Meridian Ventures, Inc., provided some of the capital to form Sidewinder. *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 6 (Dckt. No. 239). Ian Pye owned and/or controlled Meridian Ventures. *Id.* In early 2004, soon after Short ended his involvement in the company's management and operations, Pye became the new CEO and the chairman of the board of Sidewinder. *Id.* at ¶ 7.

Sidewinder owned patents and had three subsidiaries: Sidewinder North America Inc., Sidewinder Europe, and Sidewinder Asia Pacific. *Id.* at ¶ 5. The state court case that gave rise to this litigation centered on Sidewinder's "Patent Portfolio," meaning the patents owned by the company. *Id.* Specifically, the state court case involved the sale of the Patent Portfolio and the ways that sale impacted Short's interests.

In June 2005, Pye agreed to sell the company's Patent Portfolio to a former Sidewinder board member and shareholder, George Best. *Id.* at ¶ 21 ("On June 30, 2005, Pye, on behalf of

Sidewinder, signed a detailed Stock Purchase Agreement agreeing to sell Sidewinder's North American operations to Best, including the software for those operations, and 'those patents that can be identified as specifically related to the Software.'"); *id.* at ¶ 9. The sale apparently closed right away – the parties here refer to a June 2005 sale of the Patent Portfolio. *Id.* at ¶ 14; *see also* Fifth Am. Cplt., at ¶ 48 (Dckt. No. 194) ("[O]n June 30, 2005, Best purchased all the capital stock of SNA and certain SHL patents . . . ."); *id.* at ¶ 49 (alleging that the "June 30, 2005 Sale . . . included all of the patents in the Patent Portfolio").

The key fact is that Short allegedly knew nothing about that sale at that time. Pye apparently kept the sale to himself, and didn't let anyone know that he had offloaded the patents.

A few months later, Pye allegedly offered to sell the company's Patent Portfolio to Short, even though Pye had already sold it (unbeknownst to Short). According to Short, Pye offered to sell the portfolio and the Sidewinder subsidiaries to Short for $3.5 million in October 2005.[1] *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 14 (Dckt. No. 239). As consideration for that would-be purchase, Short agreed to sell his shares of Sidewinder and give up his portion of a settlement amount in a separate lawsuit. *Id.*

According to Short, he communicated with Pye about his upcoming purchase of the Patent Portfolio several times between October and November 2005. *Id.* at ¶¶ 26–29. Short now argues that he reached an oral agreement with Pye to buy the patents. But for present purposes, here's the key point: he did not bring a claim in state court for breach of an oral agreement to buy the patents. *See generally id.* at ¶ 10 (Dckt. No. 239) (summarizing Short's evolving

---

[1] There is a question whether in October 2015 Pye offered to sell the patents to Short (personally) or to another company associated with Short (specifically, a private equity company called Avantce Software, LLC). *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶¶ 14–20, 23–26 (Dckt. No. 239). The parties devote quite a few paragraphs to that issue, but it does not appear to make a difference here.

depiction in his state court complaints of his communications with Pye in October 2005 about a potential purchase of the patents).

Short didn't buy the patents. During a phone call on January 5, 2006, Pye told Short that he could not sell the Patent Portfolio to Short because he had already sold it. *Id.* at ¶ 14; *see also id.* at ¶ 42. Pye allegedly told Short that "Sidewinder had no other assets." *Id.* at ¶ 12.

Four days later, on January 9, 2006, Short sold his shares in Sidewinder to Meridian (again, the investment firm owned and controlled by Pye). *Id.* at ¶ 43. That sale of Short's stock in Sidewinder was the "focus of the Lake County Litigation." *Id.* ¶ 10. He later claimed that he didn't receive a fair price.

Almost five years later, in December 2010, Short sued Pye, Best, and others affiliated with Sidewinder in state court. *Id.* at ¶¶ 10–11. Short basically claimed that he received less for the Sidewinder shares than they were worth. *Id.* "In general, Short alleged in the Lake County Litigation that his former business partners and others had lied and concealed material facts regarding the ownership and transfer of Sidewinder's Patent Portfolio to a company owned by Best, leading Short to sell his interest in Sidewinder for less than what it was worth." *Id.* at ¶ 10.

More specifically, Short claimed in state court that "Pye and Best had entered into a scheme to divest Short of his interest in the Patent Portfolio, and to defraud him into selling his shares in Sidewinder for below value, which he did in January 2006." *Id.* at ¶ 11; *see also id.* ("Best had purchased Sidewinder's Patent Portfolio on June 30, 2005, as well as all of the capital stock of one of Sidewinder's subsidiaries, Sidewinder North America, for a $300,000.00 non-recourse promissory note and/or $1.00 without any independent valuation, when Pye and Best knew those assets were likely worth many millions."). He claimed that Pye and Best had

4

"actively concealed from Short the June 30, 2005 sale of the Patent Portfolio to Best." *Id.* at ¶ 12.

Short retained a string of lawyers, who filed a complaint and a string of amended complaints in state court. *Id.* at ¶¶ 11–12. In October 2013, the state court dismissed all of Short's claims in the fourth amended complaint, with prejudice. *Id.* at ¶¶ 11–12, 65. Counsel informed Short of the dismissal that day. *Id.* at ¶ 65.

Years later, Short opened a second front by suing his lawyers in federal court. The case at hand involves Short's legal malpractice claims against his state court lawyers, including Ted Donner, Joseph Siprut, and Brad Grayson. *Id.* at ¶ 13. So, this Court will rewind the tape, and summarize their respective roles in the state court case.

The first lawyer was Ted Donner (the movant here). Short retained him on October 15, 2010. *Id.* at ¶ 44. Donner filed the original complaint in the Circuit Court of Lake County on December 30, 2010 against seven defendants, including Pye and Best. *Id.* at ¶ 45. The state court dismissed the initial complaint without prejudice on October 14, 2011. *Id.* at ¶ 47. Donner filed an amended complaint on December 2, 2011, and filed a second amended complaint on April 9, 2012. *Id.* at ¶ 48. Short reviewed each of the three complaints in detail and approved the complaints before they were filed. *Id.* at ¶ 49.

Donner withdrew as Short's lawyer on June 7, 2012. *Id.* at ¶ 52; Fifth Am. Cplt., at ¶ 154 (Dckt. No. 194). So Donner exited the case less than two years after Short filed it.

Short retained a second attorney, Joseph Siprut (and his law firm, Siprut P.C.), on June 17, 2012. *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 52 (Dckt. No. 239). Siprut filed a third amended complaint on September 12, 2012. *Id.* at ¶ 53. On March 8, 2013, the state

court dismissed several of the claims with prejudice, and two claims without prejudice. *Id.* at ¶ 56.

Siprut didn't last as Short's attorney for even a year. On April 10, 2013, Siprut withdrew from the case. *Id.*

That day, Short retained his third lawyer, Brad Grayson (and his law firm, Strauss & Malk, LLP). *Id.* at ¶ 57. Grayson filed a fourth amended complaint on May 1, 2013. *Id.* at ¶ 64.

Grayson's tenure on the case did not last long, because the case soon fell apart. On October 4, 2013, the state court dismissed all of Short's claims with prejudice. *Id.* at ¶ 65. Grayson informed Short of the dismissal that day. *Id.*

A few weeks later, in October 2013, the state court defendants filed motions for sanctions against Short. *Id.* at ¶ 66. Grayson gave Short copies of each of the motions on the day of filing, and discussed them with Short. *Id.*; *see also* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 5–7 (Dckt. No. 247) (summarizing communications between Short and his counsel about the sanctions issue in September and October 2013); *Short v. Pye*, 2018 IL App (2d) 160405, 427 Ill. Dec. 53, 117 N.E.3d 438, 441 (2018) (confirming that the state court defendants filed motions for sanctions against Short on October 21 and October 23, 2013). The state court initially granted the motion for sanctions against Short, but reconsidered and vacated its sanctions order two years later. *See Short*, 117 N.E.3d 441; Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 66 (Dckt. No. 239); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 9.

The state court case thus ended, but the federal case had not yet started. More than two years later, in February 2016, Short filed the case at hand, meaning the case before this Court against his former attorneys. *See* Cplt. (Dckt. No. 1).

6

In the years that followed, Short filed five amended complaints in federal court. *See* First Am. Cplt. (Dckt. No. 32); Second Am. Cplt. (Dckt. No. 133); Third Am. Cplt. (Dckt. No. 141); Fourth Am. Cplt. (Dckt. No. 160); Fifth Am. Cplt. (Dckt. No. 194). This Court granted Short leave to file the fifth amended complaint shortly after the reassignment of the case. *See* 10/25/19 Order (Dckt. No. 192).

In his fifth amended complaint, Short sued all three of his attorneys – Ted Donner, Joseph Siprut (and his law firm), and Brad Grayson (and his law firm) – for legal malpractice. *See* Fifth Am. Cplt. (Dckt. No. 194). Each count of the complaint alleged that his attorneys had violated the duty of care. Short basically blamed his attorneys for failing to bring claims in state court that would have succeeded.

Short's claim against Defendant Donner appeared in Count I. *Id.* at ¶¶ 154–59. He alleged that Donner had breached his duty of care by: (1) failing to sue Sidewinder for breach of Short's oral contract with Pye; (2) failing to sue Pye and Meridian for causing Sidewinder to breach Short's oral contract with Pye; and (3) failing to adequately plead Short's claims, which led to a motion for sanctions against Short personally. *Id.* at ¶ 156.

Short has different theories, but only one claim. He brought a legal malpractice claim against Donner, and nothing else. *Id.* at ¶¶ 154–59

After extensive discovery, Donner moved for summary judgment. *See* Donner's Mtn. for Summ. J. (Dckt. No. 217). He argues that Short's malpractice claim is time-barred because he missed the two-year statute of limitations. *See* Def. Donner's Mem. in Support of Mtn. for Summ. J., at 4–5 (Dckt. No. 218). Donner also advanced a number of other arguments why, in his view, the malpractice claim fails as a matter of law.

Other defendants moved for summary judgment, too, but they later settled.

## Discussion

The parties do not discuss choice-of-law, but they take it as a given that Illinois law applies. So the Court will too.

Under Illinois law, a claim of legal malpractice requires a plaintiff to prove that "(1) the defendant attorneys owed the plaintiff a duty of care arising from the attorney-client relationship; (2) the defendants breached that duty; and (3) as a direct and proximate result of that breach, the plaintiff suffered injury." *Stevens v. McGuireWoods LLP*, 2015 IL 118652, 398 Ill. Dec. 13, 43 N.E.3d 923, 927 (2015). "The basis of a legal malpractice claim is that, absent the former attorney's negligence, the plaintiff would have been compensated for an injury caused by a third party." *Id.*

So "no malpractice exists unless counsel's negligence has resulted in the loss of the underlying action." *Ignarski v. Norbut*, 271 Ill. App. 3d 522, 207 Ill. Dec. 829, 648 N.E.2d 285, 288 (1995). A malpractice claim involves a "case within a case." *Id.* at 289. A "[p]laintiff is required to establish that but for the negligence of counsel, he would have successfully prosecuted or defended against the claim in the underlying suit." *Id.* at 288; *see also Mihailovich v. Laatsch*, 359 F.3d 892, 904–05 (7th Cir. 2004) ("These elements effectively demand that the malpractice plaintiff present two cases, one showing that her attorney performed negligently, and a second or predicate 'case within a case' showing that she had a meritorious claim that she lost due to her attorney's negligence.").

A former client must show that he or she suffered defeat at the hands of his or her own lawyer, who bungled the case and caused a loss. As the plaintiff, "the client bears the burden of proving he suffered a loss as a result of the attorney's alleged negligence." *Ignarski*, 648 N.E.2d at 288. "Damages will not be presumed . . . ." *Id.*

8

Donner argues that the statute of limitations bars Short's malpractice claim. *See* Def. Donner's Mem. in Supp. of Mtn. for Summ. J., at 4–5 (Dckt. No. 218). He also puts forward a wide range of other arguments why Short has failed to satisfy the necessary elements of a claim. *Id.* at 7–13.

After years of litigation about years of litigation, the question now is whether there is a need for more. There isn't.

## I. The Statute of Limitations

The briefs are chock-full of hotly contested issues, but there is a need to address only one. Almost two and a half years after the end of the state court case, Short filed this federal case against his attorneys, alleging legal malpractice. A malpractice claim has a two-year statute of limitations. So he missed the deadline, and the claim expired.

The only claim against Donner is legal malpractice. Under Illinois law, a malpractice claim has a two-year statute of limitations. A malpractice claim "must be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." *See* 735 ILCS 5/13-214.3(b).

The clock doesn't start ticking until the plaintiff learns of the injury under the "discovery rule." "[U]nder the discovery rule, 'when a party knows or reasonably should know both that an injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed.'" *See Rosenberger v. Meltzer, Purtill & Steele LLC*, 2021 IL App (1st) 200414-U, at ¶ 31 (2021) (unpublished) (cleaned up) (quoting *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 209 Ill. Dec. 684, 651 N.E.2d 1132, 1139 (1995)).

9

"In this context, the term 'wrongfully caused' is used in a general or generic sense, and it does not mean that knowledge of negligent conduct, the existence of a cause of action, or the full extent of injury must exist before the statute of limitations starts to run." *Id.* (citation omitted); *see, e.g.*, *Janousek v. Katten Muchin Rosenman LLP*, 2015 IL App (1st) 142989, 398 Ill. Dec. 472, 44 N.E.3d 501, 507 (2015) (holding that a claim against attorneys was time-barred because the plaintiff knew that he had been injured "even though he may not yet have known that [their] representation was partly responsible and that their conduct gave rise to a cause of action"); *Carlson v. Fish*, 2015 IL App (1st) 140526, 391 Ill. Dec. 728, 31 N.E.3d 404, 414 (2015) (same).

In a malpractice claim, the clock often starts ticking when the court enters judgment against the client. *See Suburban Real Estate Servs., Inc. v. Carlson*, 2020 Il App (1st) 191953, at *3 (2020) (finding that a legal malpractice action accrued when the trial court entered judgment against the plaintiff in the underlying suit); *Lucey v. Law Offices of Pretzel & Stouffer, Chartered*, 301 Ill. App. 3d 349, 234 Ill. Dec. 612, 703 N.E.2d 473, 479 (1998) ("Illinois courts have frequently recognized, either expressly or implicitly, a cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney."); *Mandalis v. Wentzel*, 2019 IL App (1st) 18-0455-U, at *8 (2019) (finding that the statute of limitations begins to run when the injured party has a reasonable belief the injury was caused by wrongful conduct, which generally does not occur until there is an adverse judgment, settlement, or dismissal of the underlying action).

The fifth amended complaint includes three theories of malpractice against Donner. First, Donner failed to sue Sidewinder for breaching the oral contract between Short and Pye for the purchase of the Patent Portfolio and the subsidiaries. *See* Fifth Am. Cplt., at ¶ 156.a (Dckt.

10

No. 194). Second, Donner failed to sue Pye and Meridian for causing Sidewinder's breach of the oral contract. *Id.* at ¶ 156.b. Third, Donner failed to "adequately plead Short's claims," which required Short to defend a motion for sanctions. *Id.* at ¶ 156.c.

Short's claim is time barred, under any theory. To review the bidding, Short allegedly reached an oral contract with Pye to buy the company's patents in October 2005. *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 13 (Dckt. No. 239). Short learned that the patents weren't for sale – because the company had already sold them – on January 5, 2006. *Id.* at ¶¶ 14, 42.

Donner filed a six-count complaint in state court on behalf of Short on December 30, 2010. *Id.* at ¶ 45. Short reviewed and approved the complaint (and all future amended complaints) before filing, and had "extensive involvement" in providing and approving the facts pled. *Id.* at ¶¶ 49, 67. On August 16, 2011, Short told Donner about the agreement that he had reached to buy the patents in the fall of 2005. *Id.* at ¶ 46.

In the years that followed, Donner and his successors filed a string of amended complaints, including a first amended complaint on December 2, 2011, a second amended complaint on April 9, 2012, a third amended complaint on September 12, 2012, and (finally) a fourth amended complaint on May 1, 2013. *Id.* at ¶¶ 48, 53, 64. Meanwhile, Donner withdrew on June 17, 2012. *Id.* at ¶ 52.

None of the claims landed. On October 4, 2013, the state court dismissed all of Short's claims with prejudice. *Id.* at ¶ 65. Short's counsel (Grayson) told Short about the dismissal on the same day. *Id.* So, on October 4, 2013, Short knew that his lawsuit had fallen apart, and that the state court had dismissed his claims with prejudice. *Id.*

On February 11, 2016, Short filed this federal lawsuit. *See* Cplt. (Dckt. No. 1). He brought malpractice claims against Donner and his other lawyers. *Id.* February 11, 2016 is two years, four months, and seven days after October 4, 2013.

The chronology confirms that Short waited too long to bring his malpractice claim. He knew about the oral contract because he was one of the two people who formed it. He knew what Donner put in the complaint, and what he didn't. He knew that the state court complaint didn't include a claim about a breach of an oral contract. He also knew that he could amend the complaint if he missed anything, because he filed amended complaints over and over again.

And most importantly, Short knew that his state court case collapsed in October 2013. At that point, if not before, he knew that his long-running fight about Sidewinder was over, and that he had suffered a defeat. If his lawyers were to blame for the loss, he knew everything that he needed to know to point fingers at them.

By October 2013, if not before, the clock was ticking. The state court case was over, so Short needed to act promptly if he wanted to blame his lawyers for the demise of his legal claims. The deadline was October 2015, at the latest. But instead of acting, Short waited. Short did not launch the claims against his lawyers until February 2016. He was four months late, and then some.

If anything, the chronology is even worse for Short. The original malpractice complaint in federal court did not allege anything about failing to bring a claim about an oral contract. *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 75 (Dckt. No. 239). Neither did the first amended complaint in this Court. *Id.* Or the second, or the third. *Id.* Short did not blame his

12

lawyers for failing to bring a claim about an oral contract until he filed the fourth amended

complaint on February 13, 2019.[2]  *Id.*; *see also* Fourth Am. Cplt., at ¶¶ 61, 153 (Dckt. No. 160).

So, in February 2019, Short alleged for the first time that his lawyers blew it in the

lawsuit – which ended in 2013 – by failing to include a claim about a 2005 oral contract.  That's

much too late (even if, for the sake of argument, that fourth amended complaint relates back to

the original complaint in February 2016) (which Short doesn't argue).  His ever-changing,

ever-expanding legal theories cannot obscure a simple reality – he waited too long to blame his

lawyers for the lack of a claim about a 2005 oral contract.

No one hid from Short that the state court case ended badly.  Quite the opposite.  Short

knew about the dismissal on the day that it happened.  And even then, things continued to

unravel.  The defendants in the state court case filed a motion for sanctions against Short in

October 2013.  *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 66 (Dckt. No. 239).  He

undoubtedly discovered that the state court case hadn't gone well when he was defending a

motion for sanctions.

Short points out that the state court did not grant the motion for sanctions until February

14, 2014, which is less than two years before Short filed this malpractice lawsuit on February 11,

2016.  *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 8 (Dckt. No. 242).  That's true, but it

makes no difference.  Short didn't need a ruling from the state court on the sanctions motion to

know that the state court litigation had gone up in smoke.  Short knew in October 2013 that he

---

[2]  Donner points out that Short changed his theories about the oral contract.  In the fourth amended complaint in this case (filed on February 13, 2019), Short alleged that the oral contract was between Sidewinder and Avantce.  *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 75 (Dckt. No. 239); *see also* Fourth Am. Cplt., at ¶¶ 61, 153 (Dckt. No. 160).  But in his fifth amended complaint in this case (filed on October 31, 2019), Short alleged that the oral contract was between Sidewinder and Short personally.  *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶¶ 78–80; *see also* Fifth Am. Cplt., at ¶¶ 56–57, 156 (Dckt. No. 194).

had suffered a total loss on the merits.  The sanctions motion involved who should pay for the legal skirmish – whether there should be, in effect, legal reparations to the prevailing party.

The day of the ruling on the sanctions motion (again, February 14, 2014) would make a difference only if Short did not know about Donner's alleged failures until then.  And that's simply not the case.  Short knew long before February 14, 2014 what was in, and what was out, of the complaint in state court.  It is not as if Short had no idea about what Donner included in the complaint until the state court ruled on the sanctions motion.

The malpractice theory doesn't involve an obscure, hyper-technical slip-up by the attorney, meaning a mistake that a client couldn't discover until years later.  The theory is about what the complaints alleged, and what they did not.  Short knew that the state court complaints did not contain a claim about a breach of an oral contract, because he read them and approved them before filing.  *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶¶ 49, 67 (Dckt. No. 239).

Short's last hope is to plead ignorance.  He points out that he "is not an attorney," and is simply a layperson.  *See* Pl.'s Resp. to Defs.' Mtn. for Summ. J., at 3 (Dckt. No. 242).  He adds: "The fact that Short went to law school 53 years ago, did not graduate and thus never took the Bar is irrelevant." *Id.* at 3 n.1; *see also* Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 240) (confirming that Short went to law school).

Respectfully, that response is too cute by half.  Short is no uninformed simpleton at the mercy of his lawyers.  He purports to be a sophisticated business person, well-versed in the world of wheeling and dealing patent portfolios.  He formed, bought, and sold companies, and was the CEO of Sidewinder until 2003.  *See* Fifth Am. Cplt., at ¶¶ 32, 42 (Dckt. No. 194).  In the very first sentence of his complaint, Short paints himself as a "visionary businessman." *Id.* at

14

¶ 1; *see also id.* at ¶ 22 (alleging that he formed a company with his friends, William F. Buckley, Jr. and Evan G. Galbraith). Short had the vision to see what was missing from the complaint.

It did not take special expertise or legal acumen to see what claims appeared in the state court case. If an oral contract actually existed, Short could have and should have piped up, and told Donner to file that claim. The absence of that claim wasn't a mystery, even to a layperson.

He wasn't out of the loop with the litigation, either. He actively managed the state court litigation, as revealed by the fact that he read and approved every complaint before it was filed. If nothing else, the state case and the federal case confirm that Short is comfortable in a courtroom, and isn't shy about advancing complaints and unveiling new legal theories. All told, he has filed 11 complaints – an original plus four amendments in state court, and an original plus five amendments in federal court.

Short knew what he was doing, and he knew what claims his lawyers brought on his behalf. He knew long ago that Donner did not include a claim about a supposed oral agreement. No reasonable jury could find otherwise.

Finally, Short's theory about the sanctions motion is too late, too. Short alleges that he suffered an injury when he had to defend himself against motions for sanctions in October 2013. *See id.* at ¶ 158. But Short knew about the sanctions motions at the time of filing. *See* Pl.'s Resp. to Defs.' Joint Statement of Facts, at ¶ 66 (Dckt. No. 239). He knew that he needed to defend himself, then and there.

If the need to defend himself was an injury, then Short knew about the injury when he knew about the motion for sanctions in the fall of 2013. He didn't discover a need to respond to the motion when the state court ruled against him in February 2014. By that point, he had already defended himself (unsuccessfully). If anything, a motion for sanctions was an

15

exclamation point – a bright-shining sign that something might have gone wrong in the state court case.

The state court battle is over.  And so is the case against Donner.  Short has fired a lot of shots in two different venues (and he may have fired some lawyers, too).  But he didn't launch any missives against his lawyers until February 2016.  That's too late to claim that his lawyers dropped the ball in a lawsuit that ended in October 2013.

### Conclusion

For these reasons, the Court grants Defendant Donner's motion for summary judgment.


Date:   September 3, 2021                    _____

                                            Steven C. Seeger
                                            United States District Judge

16